UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                            )<br>)<br>BRUCE A. TASSONE,     )<br>)<br>)<br>Defendant.                )<br>)<br>_____) | CRIMINAL NO. **04 CR 10023 MEL**<br><br>VIOLATIONS:<br><br>18 U.S.C. § 1341 (Mail Fraud)<br>18 U.S.C. § 2 (Aiding and Abetting) |

## INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

## INTRODUCTION

At all times material to this Information,

1. BRUCE A. TASSONE ("TASSONE") was a resident of Massachusetts and an employee of Bright Horizons Family Solutions, Inc.

2. "JRB" was a participant in the scheme to defraud who is not charged in this Information.

3. Bright Horizons Family Solutions, Inc. ("Bright Horizons") was a corporation headquartered in Watertown, Massachusetts.

4. BankNorth, N.A. was a federally insured bank with branches throughout Massachusetts.

## OVERVIEW OF THE SCHEME

5. TASSONE engaged in a scheme to defraud his employer, Bright Horizons, an operator of day care centers nationwide, by making hundreds of thousands of dollars of unauthorized purchases on his corporate credit card and not paying for them. TASSONE and JRB further defrauded the company by submitting nearly $600,000 worth of fake construction invoices for payment. Bright Horizons made payment on the invoices to a phony construction company that TASSONE and JRB had established and controlled, enabling them to reap and share the proceeds of the scheme.

### *Bright Horizons' Business and TASSONE's Job*

6. Bright Horizons styles itself as the "world's leading provider of employer-sponsored child-care, early education and work/life solutions." It operates nearly five hundred day care and education centers throughout the United States and internationally. Its centers are geared toward providing child care services to the employees of large organizations, including corporations and government agencies. For most of its centers, Bright Horizons leases space at a discounted rate from its "employer-sponsors" in exchange for making day care slots available to their employees on a preferred basis. The company also owns some of the properties that house its centers.

7. At some of its centers, Bright Horizons is responsible for developing the physical layout of the space according to the center's unique needs. At those centers, Bright Horizons was responsible for hiring and paying construction contractors.

8. From December 1999 to April 2003, TASSONE served as Bright Horizon's Vice President of Construction and Facilities, a position in which he oversaw all of Bright Horizon's

construction and development projects from the company's Watertown headquarters. As such, he was ultimately responsible for selecting and paying contractors for construction work performed at Bright Horizons' sites.

*Fraudulent Credit Card Transactions*

9. Like most corporations its size, Bright Horizons provided corporate credit cards to its senior management, including TASSONE, to enable them to pay for routine business-related expenses such as hotel stays, car rentals and meals on business trips. Company policy required card-holding employees to pay for business expenses with the card and to submit the expenses for reimbursement to Bright Horizons. The employee in turn would pay the balance on the card. If an employee neglected to pay the card balance, the credit card company would notify Bright Horizons directly.

10. Bright Horizons maintained strict rules about the use of these cards. Each card-holding employee was required to sign an acknowledgment that the card could be used only for purposes relating to Bright Horizons' business, and not for personal expenses.

11. During his tenure at Bright Horizons, TASSONE held a Diner's Club corporate card and, after Bright Horizons terminated its relationship with Diner's Club in approximately April 2002, a Bank of America credit card. He, too, acknowledged in writing that the cards were to be used only for business-related expenses.

12. Nevertheless, TASSONE repeatedly used his Bank of America corporate card to for personal transactions, some to obtain cash for himself. Specifically, beginning in July 2002, he went to Providence Pawn Brokers in Providence, Rhode Island on numerous occasions to sell valuable household effects, such as jewelry and computers. On each occasion, he would keep the

cash and then immediately repurchase the item using his Bright Horizons corporate card. Many of these transactions exceeded ten thousand dollars.

13. TASSONE never received authorization from Bright Horizon to make these purchases as he knew that none related to Bright Horizon's business and, therefore, would not have been authorized by the company.

14. Through these fraudulent transactions, TASSONE received over $100,000 in cash and charged $194,207 on his corporate credit card.

*Fictitious Construction Invoices*

15. As a way of paying the balance of the credit card, TASSONE decided to exploit his position as Vice President of Construction and Maintenance, by concocting a scheme whereby he would approve and receive payment on fictitious construction invoices.

16. TASSONE's idea was simple: he would ask someone he trusted to create a phony construction corporation in whose name TASSONE would submit phony work invoices, the payment of which he himself would approve. Once his accomplice received and deposited the checks into the corporation's bank account, they could share the proceeds of the scheme without Bright Horizons' every knowing.

17. In approximately August 2002, TASSONE raised the idea with JRB, and offered him a share of the proceeds if JRB were willing to help him. JRB agreed, and in early-September 2002, they incorporated "JRB Construction Consulting, Inc.," a Florida corporation whose only officer or director was JRB and whose corporate address was the Florida home of a relative of JRB.

18. On September 13, 2002, Tassone submitted to Bright Horizons an invoice in the

4

amount of $25,385, on letterhead bearing the name " JRB Construction Consulting, Inc." The invoice purported to reflect engineering and consulting work performed by JRB Construction on a real Bright Horizons' construction site in Jupiter, Florida. Because Bright Horizons required that the Vice President of Construction and Facilities, namely TASSONE, approve payments to contractors of over $20,000, TASSONE reviewed the invoice and approved payment on it by initialing it. Over the next seven months, TASSONE submitted and signed off on seven more phony JRB Construction invoices, ranging in amounts from $13,000 to $173,000.

19.   JRB Construction had no employees or equipment and never operated for a single day. It never did any work, construction or otherwise, for Bright Horizons or anyone else. Nevertheless, relying on TASSONE's approvals of payment, Bright Horizons paid each of the invoices.

20.   The first four payments were made by check. JRB endorsed each of the checks and deposited them into an account that JRB had established for JRB Construction at a Pittsfield, Massachusetts branch of BankNorth.

21.   After the fourth invoice, TASSONE provided instructions to Bright Horizons, purportedly at the request of JRB Construction, to pay the invoices by wire transfer into JRB's Construction account at BankNorth. Bright Horizons paid the last four invoices by wiring funds directly into the account. Bright Horizons paid a total of $557,979 to JRB Construction on the eight fraudulent invoices.

22.   The JRB Construction account served as nothing but a means to conceal the funds; the eight invoice payments were the only deposits into it. JRB controlled the account checkbook and shared the proceeds with TASSONE.

## COUNT ONE
### (Mail Fraud - 18 U.S.C. § 1341)

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

23. Paragraphs 1-22 are realleged and incorporated by reference as though fully set forth herein.

24. On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendants,

BRUCE A. TASSONE

having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing and attempting to do so, did cause persons to place in post offices and authorized depositories for mail matter, matters and things to be sent and delivered by the United States Postal Service or by private or commercial carrier, and caused to be deposited matters and things to be sent or delivered by the United States Postal Service or by a private or commercial interstate carrier, and took and received therefrom, such matters and things, and

knowingly caused to be delivered by the United States Postal Service mail or by private or commercial carrier according to the directions thereon, such matters and things, as follows:

| COUNT | DATE (on or about) | MATTER MAILED |
|---|---|---|
| 1 | 12/10/02 | UPS delivery of a Bright Horizons check # 278557 in the amount of $68,000 to JRB Construction Consulting, Inc., from Watertown, Massachusetts to 1124 Ste. Anne Shrine Road, Lake Wales, Florida 33898; |

All in violation of Title 18, United States Code, Section 1341 and 2.

Date: January 28, 2004

MICHAEL J. SULLIVAN
United States Attorney

JONATHAN MITCHELL
Assistant U.S. Attorney